[This opinion has been published in *Ohio Official Reports* at 76 Ohio St.3d 244.]

THE STATE OF OHIO, APPELLEE, *v.* BALLEW, APPELLANT.

[Cite as *State v. Ballew*, 1996-Ohio-81.]

*Criminal law—Aggravated murder—Death penalty upheld, when.*

(No. 95-1907—Submitted May 1, 1996—Decided August 7, 1996.)

APPEAL from the Court of Appeals for Hamilton County, No. C-920576.

———————————

{¶ 1} On March 17, 1990, just after midnight, defendant-appellant Tyrone Ballew and four others forced their way into a house and removed Donald Hill. Then they beat Hill and drove him to a vacant lot, where he was shot three times. Shortly after the killing, police found Hill's body. That day, police arrested several of those involved, but were unable to locate Ballew and his accomplice Patrick Coffey.

{¶ 2} In March 1990, Ballew had been attending college in Tennessee but also occasionally worked selling cocaine in Cincinnati. In Cincinnati, he stayed at apartments on Broadway and Lowell. His friends, Ulric "Shorty" Robinson and Michael "Bounce" Johnson, also sold drugs and may have worked for Ballew.

{¶ 3} The week before the murder, Ballew, Johnson, and another man visited Hill's girlfriend. Ballew told her that Hill owed him money and he was looking for him. Ballew searched her house for Hill, advising her to tell Hill when she saw him, "I'm going to find him stinking."

{¶ 4} Ballew's search for Hill proved unsuccessful. Ballew then asked Elvena Lewis (whose boyfriend owed Ballew $500) to find Hill, promising that if she did, she would not have to pay her boyfriend's debt to Ballew. On March 16, Lewis learned that Hill was staying at Charles Marshall's house and told Ballew.

{¶ 5} With his friends Patricia Pearson, Iris Martin, Jerry Baskin, and Lewis, Ballew went to get Hill in Pearson's station wagon. They stopped first at

Ballew's place on Broadway, where Ballew got a 9 mm handgun. Then they drove to Marshall's house. Failing to find Hill, they left.

{¶ 6} The group later returned to Marshall's house. Lewis went in alone and found Hill there. Lewis tried to lure him out by telling him that she had money and asking him to go with her to buy drugs. When this ruse failed, Pearson, Martin and Lewis went to get more help, and Ballew and Baskin stayed to watch Marshall's house.

{¶ 7} Pearson picked up "Bounce" Johnson, "Shorty" Robinson, and Coffey and drove back to Marshall's house. On the way back, Pearson stopped at the Lowell apartment, where Coffey obtained a shotgun and a 9 mm Baretta. He gave the Baretta to Robinson. Ballew had his own 9 mm handgun.

{¶ 8} Around midnight, Lewis reappeared at Marshall's house, and Marshall let her in. Marshall had expected just Lewis, but Ballew, Coffey, Johnson, and Robinson rushed in behind Lewis and pushed Marshall aside. Coffey held a shotgun to Marshall's face and told him that if he "breathed hard," he "would be killed." Then Lewis told Coffey, "no, no, don't do that, he's not the one, *** don't hurt him at all." Ballew and others went to the kitchen where Hill was.

{¶ 9} In the kitchen, Ballew and Robinson began to beat Hill. Hill kept saying that he could get the money. Ballew said that he just wanted to talk, but Hill refused to leave with him. Then, Robinson picked Hill up off the floor, "walked" Hill out of the house, and the group dragged Hill to the car. As Hill and the group left, Marshall was told, "If you call the police, we'll be back." Despite the threat, police were called and investigated Hill's kidnapping.

{¶ 10} Ballew, Hill, Coffey, Baskin, Johnson, Robinson, Martin, and Lewis got in the station wagon, and Pearson drove off. Within a few minutes, Lewis and Martin were let out, given $20, and told to take a cab home. After they got out, Coffey said to Hill, "I ought to shoot you right now and have no conscience in killing this man." Ballew said, "[A]in't nobody going to shoot nobody."

2

{¶ 11} While in the car, Ballew and others kept asking Hill where his money was, and Hill kept replying that he would get the money. Hill was struggling and kicking, and Ballew hit him with his fist and his gun. The others also struck Hill. Ballew and Coffey told Pearson where to drive, and they eventually stopped at a vacant lot. There, all the men got out, and Pearson waited in the car.

{¶ 12} All five men started to walk Hill down a slope in the vacant lot. Coffey left his shotgun in the car but took back his Baretta from Robinson. Some testimony indicates that Ballew still had his 9 mm pistol on him. At Coffey and Ballew's direction, Baskin stayed near the street as a lookout. While walking down the slope, Robinson asked if Ballew was going to shoot Hill. Ballew replied, "[A]ll I'm here to do is talk to the man and to scare the man."

{¶ 13} At the bottom of the slope, Coffey and Ballew kept asking Hill for money. Several of the men hit Hill with their fists, and Johnson used a stick. Hill, on his knees or sitting on the ground, pleaded to be let alone. Then, Johnson and Robinson left Coffey and Ballew alone with Hill at the bottom of the slope. While at the top, Pearson, Baskin, Johnson, and Robinson heard several shots. Pearson claimed that Ballew returned before she heard three shots, but earlier she had sworn that she saw Baskin, instead of Ballew, return. Baskin and Johnson testified that only Coffey and Ballew were with Hill at the bottom of the slope when the shots were fired.

{¶ 14} After the shots, everybody ran to the car. Coffey and Ballew arrived at the car last, but Hill was not with them. After Pearson drove off, Ballew told everyone to quiet down so Pearson would not be nervous while driving. Robinson reminded Ballew that he had said he would not kill Hill, but Ballew replied that "they had to do what they had to do." Baskin recalled that Coffey made a similar remark. Ballew also said to Coffey, "You didn't think I would go down there with you." Robinson was upset, but Ballew told him, "[E]verybody have to be strong about this." The group then split up, and Coffey and Ballew hid out and left town.

**{¶ 15}** Around 1:45 a.m., March 17, Cincinnati police officers responded to a report of shots fired on Kerper Avenue. After a brief search, the officers found Hill's body in an overgrown, downward-sloping, vacant lot.

**{¶ 16}** The coroner concluded that Hill, age fifty-six, died from "blood loss due to multiple gunshot wounds." Hill had been shot three times in the back, once on the right side, once on the left, and again near the neck. One bullet pierced his heart and both lungs, and another bullet struck his liver and a kidney. Hill also had recent blunt-force cuts and bruises on his head and wounds on his hand. Extensive needle tracks on Hill's arms and one leg evidenced repeated injections. Blood tests on Hill revealed the presence of cocaine, methadone, marijuana, and alcohol.

**{¶ 17}** The coroner recovered two bullets from Hill's body and concluded that the same caliber bullets could have caused all three bullet wounds. A firearms examiner testified that these two bullets were fired from the same gun and were consistent with "90 grain Frontier 9 millimeter Luger ammunition." Police found a "Frontier" shell casing at the scene and unfired Frontier bullets at the Broadway address. Rifling characteristics on the bullets from Hill's body were similar to those made by Browning or Baretta 9 mm semiautomatic pistols, but police never recovered any weapons.

**{¶ 18}** At trial, Ballew called Coffey as a key defense witness. Lewis, Pearson, Baskin, Johnson, and Robinson testified for the state; some did so reluctantly. Each had pled guilty to various offenses, in accordance with plea agreements, and some charges against them had been dismissed. Coffey pled guilty to the aggravated murder of Hill and received a life sentence, with parole eligibility after twenty-three years. At the time of trial, Coffey was in prison for bank robberies committed after Hill's murder.

**{¶ 19}** Coffey claimed that he, not Ballew, organized and directed the burglary and Hill's kidnapping because Hill owed him money. Ballew was simply "fronting" for Coffey. Coffey testified that Hill left Marshall's house "on his own

recognizance," *i.e.*, voluntarily. Coffey denied any prior plan to kill Hill and claimed he just wanted Hill to pay his debts. According to Coffey, Ballew never had a gun that evening, and Coffey controlled the only guns: a shotgun and a 9 mm Baretta. Coffey claimed that Ballew was at the bottom of the hill only momentarily, and then left. Hill began "talking crazy," cursing Coffey, and refusing to pay. Hence, Coffey shot Hill three times "in a heat of rage," on a sudden impulse, with "no prior calculation."

{¶ 20} The jury convicted Ballew, as charged, on two counts of aggravated murder; Count One alleged prior calculation and design, and Count Two charged murder during kidnapping. Both counts contained a death-penalty specification charging murder during a kidnapping; the trial court merged the two murder counts for penalty purposes. The jury also convicted Ballew of kidnapping (Count Three) and aggravated burglary (Count Four). Additionally, each count contained firearm specifications, for which the jury returned guilty verdicts.

{¶ 21} At the sentencing phase of the trial, Ballew presented the testimony of several witnesses, mostly by deposition. Tarji Thomas, Ballew's girlfriend, met him during the summer of 1990 in Seattle, and Ballew lived there as a fugitive for over a year. Thomas described Ballew as a "concerned" and "sweet" person, who worked, went to church, and was involved in youth activities and basketball clinics. Ballew was nonviolent and not involved in illegal activities. Minerva Grayson, Ballew's Seattle landlady, thought he was a "pretty nice guy." Ballew lived in her house for seven to eight months, worked, and promptly paid his bills. He also got along very well with her mother and teenage daughter.

{¶ 22} Marilyn Matthews, his cousin, helped to raise Ballew, and testified that he was a "very good child." Ballew's great-grandmother primarily raised Ballew, since both of his parents had drug problems and were in prison.

{¶ 23} Don Byars served as Ballew's "big brother" in the Lexington, Kentucky Big Brothers program. When Byars first met him, Ballew was a "bubbly,

12-year-old, athletic" boy, "inquisitive, [and] smart." Ballew attended church regularly and did well in school, but his grades dropped to Bs and Cs in high school. He liked playing sports, being outdoors, and "got along with people very well." In high school, Ballew concentrated on basketball. Before graduating, he transferred to Millersburg Military Institute, where he played varsity basketball. Ballew was "even keeled," displayed a "winning attitude," and was neither violent nor a drug user. After graduation, he got a basketball scholarship to a Nebraska college. After a year, he transferred to a Mississippi college, and Byars lost contact with him.

{¶ 24} A presentence investigation ("PSI") and a psychological report revealed additional details. Ballew was born on November 23, 1967. After graduating from Millersburg, he attended college in Nebraska, Mississippi, and Tennessee. In college, he was an average student, and he worked during the summers. He last worked as a basketball instructor in Seattle. Although not married, Ballew had a two-year-old daughter and a ten-month-old son.

{¶ 25} The psychologist described Ballew as intelligent, alert, responsive, cooperative, "overtly pleasant," and an "intellectually capable young man who is free from overt signs of significant psychiatric illness or neurological abnormality." Although Ballew was depressed and displayed narcissistic personality traits, he did not warrant a personality disorder diagnosis. Ballew denied using drugs or abusing alcohol. After Hill was shot, Ballew hid out in Seattle until his arrest in Alaska in August 1991. Ballew had no prior criminal record aside from traffic violations.

{¶ 26} In the PSI and psychologist's report, Ballew admitted that he was selling drugs in Cincinnati in March 1990, while on a school break. Hill owed him money from drug transactions, and Ballew needed the money to return to college. With others, he forcibly entered a house to get Hill and beat him up. Yet, he denied that he shot Hill, ordered his death, or knew that Coffey would shoot him. He told Coffey not to hurt Hill, and he felt remorse over Hill's death.

{¶ 27} In an unsworn statement, Ballew asserted that Hill introduced him to selling drugs as a way of earning spending money. Ballew claimed that his friends Baskin, Johnson, and Robinson all worked for Hill selling drugs. Hill owed them all money, a total of $4,500, including Hill's $2,500 debt to Ballew. Ballew admitted that they went to Marshall's house, but he claimed that Hill left voluntarily to get his money.

{¶ 28} Ballew denied having a gun that evening, shooting Hill, or planning or intending Hill's death. He claimed not to have known that Hill was dead until the next day. He said that only Baskin and Coffey, and at an earlier time Robinson, had guns. Everyone kept hitting Hill as they walked down the hill, and in response, Hill repeatedly said, "I'm going to get the money, all I need is a chance." Ballew claimed that he, Baskin, Johnson, and Robinson all left before shots were fired. Ballew further told the jury, "You made a terrible mistake. *** I did not take that man's life ***, nor did I give directions."

{¶ 29} The jury recommended the death penalty. At sentencing, Ballew's father asked the trial court to "[g]ive him a chance to live." Ballew said that he was "sorry about what happened" and asked the court "to have mercy on me and give me a chance." The trial court sentenced Ballew to death and to prison terms for the other offenses. The court of appeals affirmed the convictions and death penalty.

{¶ 30} The cause is now before this court upon an appeal as of right.

———————————

*Joseph T. Deters*, Hamilton County Prosecuting Attorney, and *Ronald W. Springman, Jr.*, Assistant Prosecuting Attorney, for appellee.

*Becker, Reed, Tilton & Hastings* and *Robert R. Hastings, Jr.*, for appellant.

———————————

**ALICE ROBIE RESNICK, J.**

{¶ 31} In this appeal, Ballew advances nine propositions of law. Finding none meritorious, we affirm his convictions. We have also independently weighed

the aggravating circumstance against mitigating factors, and compared the sentence to those imposed in similar cases, as R.C. 2929.05(A) requires. As a result, we affirm the sentence of death.

Sufficiency of Evidence (I, II)

{¶ 32} In Proposition of Law I, Ballew argues that the evidence was insufficient to establish that he specifically intended to cause Hill's death, or that he acted with prior calculation and design as charged in Count I. In Proposition of Law II, Ballew argues that the evidence was insufficient to convict him of specifically intending to cause Hill's death during a kidnapping as charged in Count II. Ballew claims that Coffey alone shot Hill and that Coffey did so on the spur of the moment, in Ballew's absence, and without his prior knowledge.

{¶ 33} In a review for sufficiency, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus, following *Jackson v. Virginia* (1979), 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560. The weight to be given the evidence and the credibility of witnesses are primarily jury issues. *State v. Waddy* (1992), 63 Ohio St.3d 424, 430, 588 N.E.2d 819, 825; *State v. DeHass* (1967), 10 Ohio St.2d 230, 39 O.O.2d 366, 227 N.E.2d 212, paragraph one of the syllabus.

{¶ 34} Admittedly, no eyewitness testified to seeing Ballew shoot Hill. Yet, despite Coffey's claims that only he was the triggerman, sufficient circumstantial evidence existed to find that Ballew specifically intended to cause Hill's death. In fact, circumstantial evidence may "'be more certain, satisfying and persuasive than direct evidence.'" *State v. Lott* (1990), 51 Ohio St.3d 160, 167, 555 N.E.2d 293, 302, quoting *Michalic v. Cleveland Tankers, Inc.* (1960), 304 U.S. 325, 330, 81 S.Ct. 6, 11, 5 L.Ed.2d 20, 25.

**{¶ 35}** Specifically, we hold that the evidence was sufficient to allow the jury to find that Ballew specifically intended to murder Hill. Even if Ballew did not personally shoot Hill, the jury could reasonably find under the evidence that Coffey did so in accordance with their agreed plan. According to Hill's girlfriend as well as Lewis, Ballew had been looking for Hill for several days. Ballew threatened Hill's girlfriend that when she found Hill, she should tell him he would be "stinking." When Lewis's effort to trick Hill into leaving Marshall's house failed, Ballew put together an armed force including himself, Coffey, Robinson, and Johnson to forcibly take Hill from the Marshall house.

**{¶ 36}** Ballew, not Coffey, confronted Hill in the kitchen and helped walk Hill out. In the car, Ballew kept asking Hill where his money was while he and others kept hitting Hill. Also, Ballew had his own 9 mm pistol and used it to pistol-whip Hill in the car. Ballew directed Pearson where to drive and when to stop. After they stopped, Ballew and the other men walked Hill into the vacant lot and kept hitting Hill as they did so. Then, Baskin, Johnson, and Robinson left Hill alone with Coffey and Ballew. While Hill was with Coffey and Ballew, the others heard shots.

**{¶ 37}** Whether Coffey or Ballew or both fired the shots killing Hill was a question for the jury. Both were armed with 9 mm pistols, and police recovered no weapons and only two of the three bullets fired. But even if only Coffey fired the shots, the evidence was sufficient for the jury to find that Coffey did so with Ballew's concurrence. Back in the car, Ballew said "they had to do what they had to do," and remarked to Coffey that he had surprised Coffey by being "down there" with him. We find the evidence sufficient to support the jury's finding that Ballew specifically intended to cause Hill's death.

**{¶ 38}** That same evidence also supported the jury's finding in Count I that Ballew acted to kill Hill with prior calculation and design. "'[P]rior calculation and design' requires 'a scheme designed to implement the calculated decision to kill.'"

*State v. D'Ambrosio* (1993), 67 Ohio St.3d 185, 196, 616 N.E.2d 909, 918, quoting *State v. Cotton* (1978), 56 Ohio St.2d 8, 11, 10 O.O.3d 4, 6, 381 N.E.2d 190, 193. The facts show that Ballew "adopted a plan to kill." *State v. Toth* (1977), 52 Ohio St.2d 206, 213, 6 O.O.3d 461, 465, 371 N.E.2d 831, 836.

{¶ 39} Ballew devoted energy and persistence to find Hill, kidnap him, and then kill him. Hill owed him $2,500, yet Hill was a drug user and apparently had no funds. Having found Hill, Ballew organized an armed group to forcibly kidnap him. Then Ballew and his gang beat up Hill and drove him to a deserted vacant lot. In fact, the organized capture of Hill, his forcible abduction, and his early-morning "last ride" reflect the traditional earmarks of a gangster-style slaying.

{¶ 40} The jury could reasonably reject Ballew's claim that Coffey unilaterally decided, at the last moment, to kill Hill. Ballew organized far more effort than necessary just to confront or scare Hill. Under the circumstances, the jury could reasonably find that Ballew not only specifically intended to kill Hill, but that he acted with prior calculation and design to do so. We also hold that the evidence fully supported the jury's finding that Hill was murdered during the course of the kidnapping.

Instructions (III, IV)

{¶ 41} In Proposition of Law III, Ballew argues that the trial court committed plain error in the guilt phase by failing to instruct the jury properly on the death-penalty specification. Ballew argues that a key issue in the case was whether he was the "principal offender," as alleged in the death-penalty specification in R.C. 2929.04(A)(7). Ballew relies upon *State v. Taylor* (1993), 66 Ohio St.3d 295, 612 N.E.2d 316. *Taylor* recognized that even though a defendant who aided and abetted a murder could be charged as if he were a principal to the murder under the complicity statute, such a defendant is not "'the principal offender' for purposes of imposing the death penalty under R.C. 2929.04(A)(7)." *Id*. at syllabus.

**{¶ 42}** Ballew argues, citing *Taylor*, that a finding of aiding and abetting cannot be bootstrapped into a finding that he is the principal offender under R.C. 2929.04(A)(7). In essence, Ballew contends that the jury may have been confused as to whether Ballew was guilty of the death-penalty specification simply because he was guilty of complicity in the murder.

**{¶ 43}** At trial, Ballew did not object to instructions on issues he now raises. His failure to object "constitutes a waiver of any claim of error relative thereto, unless, but for the error, the outcome of the trial clearly would have been otherwise." *State v. Underwood* (1983), 3 Ohio St.3d 12, 3 OBR 360, 444 N.E.2d 1332, syllabus. Accord *State v. Long* (1978), 53 Ohio St.2d 91, 7 O.O.3d 178, 372 N.E.2d 804, paragraph two of the syllabus.

**{¶ 44}** Here, we find no outcome-determinative plain error. The trial court adequately instructed the jury on the elements of the two aggravated murder charges and stressed that Ballew must have specifically intended to cause Hill's death before he would be guilty of aggravated murder. Also, the trial court charged the jury, following the statutory language in R.C. 2929.04(A)(7), to find whether "the defendant is guilty of *** kidnapping, and the defendant was the principal offender in the commission of the aggravated murder or if not the principal offender, committed the aggravated murder with prior calculation and design ***."

**{¶ 45}** We find purely speculative any claim that the jury confused complicity in the murder with whether Ballew was the actual killer. As we held earlier, the jury could reasonably find in this case that Ballew purposely engaged in a scheme designed to end with Hill's murder. Thus, it is irrelevant whether Ballew was the principal offender, since R.C. 2929.04(A)(7) only requires a finding that "either" Ballew was the principal offender "or" he committed the murder with prior calculation and design.

**{¶ 46}** *Taylor* is distinguishable. In *Taylor*, 66 Ohio St.3d at 306, 612 N.E.2d at 324, the court also found insufficient evidence of prior calculation and

design.   In this case, as we determined earlier, the evidence supports the jury's finding of prior calculation and design.

**{¶ 47}** Nor was Ballew prejudiced because the jury was not required to specifically find whether he was the principal offender or whether he acted with prior calculation and design under the (A)(7) specification.  Ballew did not request any such instruction, thereby waiving the issue absent plain error.  No "patchwork" verdict was involved here.  The jury specifically and unanimously found in Count I that Ballew, in killing Hill, did so with prior calculation and design.   Thus, Ballew's guilt of the (A)(7) capital specification does not rest on whether he was the "principal offender" under the (A)(7) death-penalty specification.   Under the circumstances, the failure to specifically instruct on a requirement of unanimity as to either "principal offender" or "prior calculation and design" under (A)(7) does not constitute plain error.  *State v. Burke* (1995), 73 Ohio St.3d 399, 405, 653 N.E.2d 242, 248; *State v. Woodard* (1993), 68 Ohio St.3d 70, 75, 623 N.E.2d 75, 79.

**{¶ 48}** In Proposition of Law IV, Ballew argues plain error because the trial court's sentencing instructions failed to precisely describe the specified aggravating circumstance.   Unquestionably, the trial court did not identify the (A)(7) aggravating circumstance in the sentencing instructions as precisely as the trial court might have.   Instead, the court simply referred to the "aggravating circumstance" of which the jury found the accused guilty, or "the nature and circumstance of the aggravated [*sic*] circumstances."

**{¶ 49}** However, we find no plain error.  Ballew did not complain at trial about the instructions' failing to more specifically define the aggravating circumstance, and he has not demonstrated plain error here, *i.e.*, that "but for the error, the outcome of the trial clearly would have been otherwise."  *Underwood*, syllabus; *State v. Cook*, 65 Ohio St.3d at 527, 605 N.E.2d at 83.  See, also, *State v. Hill* (1995), 73 Ohio St.3d 433, 439, 653 N.E.2d 271, 278.

**{¶ 50}** In referring to the aggravating circumstance in the guilt phase, the trial court referred to the (A)(7) factor by using the statutory language. Also, the prosecutor precisely referred to the aggravating circumstance in the penalty phase. Further, the court specifically instructed on R.C. 2929.04(B)(6) as a potential mitigating factor, directing the jurors to consider as possible mitigation whether "the defendant was a participant in the offense but not the principal offender, the degree of the defendant's participation in the offense and the degree of the defendant's participation in the acts that led to the death of the victim ***."

**{¶ 51}** Additionally, the trial court in this case did not inject nonstatutory aggravating circumstances into sentencing as condemned in *State v. Davis* (1988), 38 Ohio St.3d 361, 367-372 , 528 N.E.2d 925, 931-936. Nor did the trial court improperly refer to "principal offender" and "prior calculation and design" as separate, independent aggravating circumstances, as did the trial court in *State v. Penix*, 32 Ohio St.3d at 370, 513 N.E.2d at 745. Thus, we reject Ballew's Proposition of Law IV.

### Jury Issues (V, IX)

**{¶ 52}** In Proposition of Law V, Ballew argues that the prosecution improperly exercised a peremptory challenge against prospective juror Jamison based on his race. See *Batson v. Kentucky* (1986), 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69. However, Ballew did not raise this jury issue at trial and thus waived all but plain error. *State v. Lundgren* (1995), 73 Ohio St.3d 474, 485, 653 N.E.2d 304, 317; *State v. Seiber* (1990), 56 Ohio St.3d 4, 15, 564 N.E.2d 408, 421. Moreover, race-neutral reasons may well explain the prosecutor's challenge to Jamison.[1] Since Ballew never objected at trial, the prosecutor never had an opportunity to explain his reasons. The issue is therefore waived.

---

1. Jamison played football extensively, and the prosecutor may have felt that he would identify too closely with Ballew based on their common athletic background. Also, Jamison thought the

**{¶ 53}** Ballew also complains that jurors were peremptorily challenged based on their opposition to the death penalty. Again, Ballew waived the issue by not objecting at trial. Moreover, apart from excluding jurors based on race or gender, "prosecutors can exercise a peremptory challenge for any reason, without inquiry, and without a court's control." *State v. Seiber*, 56 Ohio St.3d at 13, 564 N.E.2d at 419. See, also, *State v. Cook,* 65 Ohio St.3d at 518, 605 N.E.2d at 77; *State v. Evans* (1992)*,* 63 Ohio St.3d 231, 249, 586 N.E.2d 1042, 1057. Thus, we reject Proposition of Law V.

**{¶ 54}** We summarily reject Proposition of Law IX, since this issue challenging the process of death-qualifying jurors has been resolved by other cases. *State v. Poindexter* (1988), 36 Ohio St.3d 1, 520 N.E.2d 568, syllabus; *State v. Maurer* (1984), 15 Ohio St.3d 239, 15 OBR 379, 473 N.E.2d 768, paragraph two of the syllabus.

---

criminal justice system was biased against blacks. Compare *State v. Hill*, 73 Ohio St.3d at 445, 653 N.E. 2d at 282; *State v. Hernandez* (1992), 63 Ohio St.3d 577, 589 N.E.2d 1310.

Selective Enforcement (VI)

{¶ 55} In Proposition of Law VI, Ballew argues that the prosecutor engaged in wrongful selective enforcement of the death penalty statutes. Ballew complains that Patrick Coffey, equally culpable in Hill's death, was allowed to plea bargain and escape the death penalty. We find no merit in Ballew's complaint.

{¶ 56} Coffey did plead guilty to the same charges levied against Ballew. However, the prosecutor offered Ballew the same plea-bargain arrangement he gave to Coffey, *i.e.*, a life sentence, with parole eligibility after twenty-three years, for aggravated murder and concurrent prison terms for kidnapping and aggravated burglary. Ballew personally rejected that offer, against the advice of his retained counsel, and chose to face capital charges instead. Ballew cannot complain now because Coffey, offered the same choice, pled guilty. None of the others involved in the abduction participated directly in killing Hill, nor were they even present when Hill was shot. Thus, we categorically reject any claim of disparate treatment. *State v. Lawson* (1992), 64 Ohio St.3d 336, 346, 595 N.E.2d 902, 910; *State v. Flynt* (1980), 63 Ohio St.2d 132, 134, 17 O.O.3d 81, 82, 407 N.E.2d 15, 17.

Prosecutorial Misconduct (VII)

{¶ 57} In Proposition of Law VII, Ballew claims that the prosecutor erred in questioning Ballew's accomplices and in final arguments. Ballew argues that the prosecution improperly "rehabilitate[d] its own witnesses every time they gave an answer that differed from the answer the prosecution anticipated."

{¶ 58} Yet, aside from a sustained objection as to form, and another for unstated reasons, Ballew did not object on issues he now raises. Thus, he waived all but plain error. *State v. Lundgren*, 73 Ohio St.3d at 485, 653 N.E.2d at 317; *State v. Williams* (1977), 51 Ohio St.2d 112, 5 O.O.3d 98, 364 N.E.2d 1364, paragraph one of the syllabus.

{¶ 59} In this case, the prosecutor did at times refer witnesses to their prior written statements, which were inconsistent with their trial testimony. Counsel may

properly do so only under very limited conditions. Under Evid.R. 607, "the credibility of a witness may be attacked by the party calling the witness by means of a prior inconsistent statement only upon a showing of surprise and affirmative damage." Additionally, a party may refresh the recollection of a witness under Evid.R. 612 by showing him or her a prior statement. However, a party may not read the statement aloud, have the witness read it aloud, or otherwise place it before the jury. See 1 Giannelli & Snyder, Evidence (1996) 477-478, 574-575; *Dayton v. Combs* (1993), 94 Ohio App.3d 291, 298, 640 N.E.2d 863, 868.

{¶ 60} Where Ballew did not object, the record does not demonstrate whether the prosecutor could have legitimately claimed surprise and affirmative damage under Evid.R. 607. The witnesses, Ballew's accomplices and friends, appear at times to have been hostile witnesses. At other times, the prosecutor could have relied upon his right to refresh recollection under Evid.R. 612. The murder occurred in March 1990, more than two years before the June 1992 trial, and memories may have dimmed. On the single occasion when Ballew did object, we find the error not prejudicial.

{¶ 61} Additionally, we find that any other prosecutorial lapse in proper questioning did not amount to plain error. See *State v. Lundgren*, 73 Ohio St.3d at 487, 653 N.E.2d at 319. Ballew received a fair trial. See *State v. Landrum* (1990), 53 Ohio St.3d 107, 111, 559 N.E.2d 710, 717; *State v. Apanovitch* (1987), 33 Ohio St.3d 19, 24, 514 N.E.2d 394, 400.

{¶ 62} We also reject Ballew's plain-error complaints as to the prosecutor's closing arguments. None of the prosecutor's arguments or remarks, even if improper, were outcome-determinative so as to constitute plain error. See *State v. Landrum*, 53 Ohio St.3d at 111, 559 N.E.2d at 718; *State v. Williams* (1995), 73 Ohio St.3d 153, 168-169, 652 N.E.2d 721, 734; *State v. Lott,* 51 Ohio St.3d at 165, 555 N.E.2d at 300.

**{¶ 63}** "Prosecutors are entitled to latitude as to what the evidence has shown and what inferences can be drawn therefrom." *State v. Richey* (1992), 64 Ohio St.3d 353, 362, 595 N.E.2d 915, 924. Accord *State v. Grant* (1993), 67 Ohio St.3d 465, 482, 620 N.E.2d 50, 68. The closing argument must be reviewed in its entirety to determine prejudicial error. *State v. Frazier* (1995), 73 Ohio St.3d 323, 342, 652 N.E.2d 1000, 1016; *State v. Moritz* (1980), 63 Ohio St.2d 150, 157, 17 O.O.3d 92, 97, 407 N.E.2d 1268, 1273.

**{¶ 64}** Here, the prosecutor did not err by arguing that Coffey was a principal to these offenses, that his testimony was incredible and contrary to other witnesses, and that the jury should not lose sight of the evidence. See *State v. Waddy*, 63 Ohio St.3d at 435, 588 N.E.2d at 828-829. The prosecutor fairly argued that Ballew was a principal to the murder and commented on the evidence of his guilt. The prosecutor appropriately argued that Ballew had foretold Hill's death, *i.e.*, "going to find him stinking," and that Ballew never challenged Coffey in the car after the murder. Compare *State v. Webb* (1994), 70 Ohio St.3d 325, 329, 638 N.E.2d 1023, 1028-1029. The prosecutor also correctly identified the aggravating circumstance in arguing for the death penalty. Compare *State v. Wogenstahl* (1996), 75 Ohio St.3d 344, 355, 662 N.E.2d 311, 321.

**{¶ 65}** Although improper, the prosecutor's expression of his personal opinion that Coffey "was the worse [*sic*] witness I have ever seen" was not crucial. Comments that jurors represent justice or the conscience of the community do not constitute plain error. See *State v. Grant*, 67 Ohio St.3d at 484, 620 N.E.2d at 70; *State v. Tyler* (1990), 50 Ohio St.3d 24, 40, 553 N.E.2d 576, 595. We reject Proposition of Law VII.

Ineffective Assistance of Counsel (VIII)

{¶ 66} In Proposition of Law VIII, Ballew argues that his retained counsel at trial did not provide him the effective assistance of counsel that is constitutionally required.

{¶ 67} Reversal of a conviction or sentence based upon ineffective assistance requires (a) deficient performance, "errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment"; and (b) prejudice, "errors *** so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland v. Washington* (1984), 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674, 693. As to deficient performance, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id*. at 689, 104 S.Ct. at 2065, 80 L.Ed.2d at 694.

{¶ 68} We find that Ballew's counsel presented strong, vigorous, and competent representation at the guilt phase. Counsel developed a coherent and consistent defense theory that Coffey shot Hill without any prior plan to do so, and that Ballew was not present. Counsel presented Coffey's testimony to that effect, and argued that theory in closing. That theory, although unsuccessful, fit into the testimony of other witnesses and reflected competent representation. In presenting that theory, counsel need not have complicated his argument by technical references to "principal offender" or complicity. The instructions, as given, adequately presented that defense. See discussion in connection with Propositions of Law III and IV. Counsel is not required to raise meritless claims of prosecutorial misconduct.

{¶ 69} Consistent with the evidence, counsel made a reasoned tactical choice in referring to Hill as being "executed" or "gunned down," since Ballew blamed Coffey. Given the numerous accomplices who were prosecution witnesses, and their extensive pretrial statements and testimony, counsel could reasonably

18

choose not to interview these witnesses. Counsel did forcefully attack their credibility, *e.g.*, by arguing that these witnesses "are all whores *** bought and paid for," through the plea agreements. Nonetheless, Pearson and others, at times, testified favorably to Ballew in an effort to help him. Given that strategy, counsel could make a reasoned tactical choice not to become diverted by other issues, *e.g.*, sequence of shots, recovery of off-site ammunition, degree of darkness at the time of the offense.

**{¶ 70}** Contrary to Ballew's claims, his counsel's presentation at the penalty phase was not deficient, disorganized, or confused. His counsel presented one witness in person, and the deposition testimony of three out-of-state witnesses, including two from the West Coast. The record does not reflect that any other favorable testimony was available. Counsel did the best he could with what he had. *State v. Post* (1987), 32 Ohio St.3d 380, 388, 513 N.E.2d 754, 763. Also, Ballew made an extensive unsworn statement, and his final admonishment of the jury in that statement may have been designed to raise residual doubt. See *State v. Watson* (1991), 61 Ohio St.3d 1, 17, 572 N.E.2d 97, 111.

**{¶ 71}** However, we do agree that counsel's extremely brief final argument on the penalty was questionable. In argument, counsel said that he felt "very strongly" but so far had not "been very effective." He stated that "the only thing I'm going to say to you is, you've heard the evidence," including "some evidence" on several mitigating factors. But "[i]f that's not sufficient, then there isn't anything else I can do." Counsel's failure to speak more forcefully in urging a life sentence represented a tactical choice. Ballew failed to establish that his counsel's performance fell "below an objective standard of reasonable representation." *State v. Bradley* (1989), 42 Ohio St.3d 136, 538 N.E.2d 373, paragraph two of the syllabus.

**{¶ 72}** Moreover, Ballew fails to establish prejudice arising from his counsel's performance in either the guilt or the penalty phase. To show prejudice,

"the defendant must prove that there exists a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different." *Id*. at paragraph three of the syllabus. We find no basis to believe that different tactical choices would have made any difference in the guilt phase in view of the numerous witnesses and the strong evidence of Ballew's guilt.

{¶ 73} Nor has Ballew shown "a reasonable probability" that different tactical choices, such as a longer closing argument at the penalty phase, would have made any difference. Our independent sentence evaluation suggests that a lengthy argument during the sentencing phase would not have altered the outcome. Thus, Ballew failed to establish prejudice as *Strickland* requires. We reject Proposition of Law VIII.

## INDEPENDENT SENTENCE EVALUATION

{¶ 74} After independent assessment, we find that the evidence clearly proves the aggravating circumstance of which Ballew was convicted, *i.e.*, murder during a kidnapping in which either Ballew was the principal offender or the murder was done with prior calculation and design. R.C. 2929.04(A)(7). As to possible mitigating factors, we find nothing mitigating in the nature and circumstances of the offense. Ballew organized an armed gang to forcibly take Hill from a place of safety, Marshall's home, and give him an early morning "last ride." During Hill's final moments, Ballew and the others kept hitting him, even as they were about to kill him. Then, Hill was shot three times in the back and left to die alone.

{¶ 75} We find only modest mitigating features in Ballew's history, character, and background. Ballew was born into disadvantaged circumstances, with his parents in jail or absent, and he was raised by his great-grandmother. Despite those hardships, a "Big Brother" befriended him. As a result, Ballew graduated from a private school and attended college on an athletic scholarship. He appears to have some attributes of natural leadership and the ability to influence others. Yet his voluntary choice to sell drugs diminishes that favorable background.

**{¶ 76}** We find the statutory mitigating factors in R.C. 2929.04(B)(1) through (3) are inapplicable. We find the mitigating factor in R.C. 2929.04(B)(4) (youth) entitled to little weight, since Ballew was twenty-two at the time of the offense. We accord some weight to the mitigating factor in R.C. 2929.04(B)(5), since Ballew had no prior convictions except for traffic offenses. However, the weight of that factor is diminished by Ballew's admitted drug-dealing. See *State v. Slagle* (1992), 65 Ohio St.3d 597, 614, 605 N.E.2d 916, 931. The factor in R.C. 2929.04(B)(6) (nonprincipal offender) would be entitled to weight if Ballew did not personally shoot Hill. However, we find the evidence sufficient to believe that he did. We find no "other factors," R.C. 2929.04(B)(7), significant or relevant. In his own unsworn statement, Ballew disclaimed any plan to kill Hill and expressed little remorse. We give no weight to residual doubt. We also find that Ballew had no significant mental problems entitled to mitigating weight as an "other factor."

**{¶ 77}** We conclude that the aggravating circumstance outweighs the mitigating factors present in this case beyond a reasonable doubt. Ballew chose to exact retribution for an unpaid debt in a brutal and cruel manner. Moreover, he enlisted others in his nefarious criminal enterprise, and several of them were sentenced to prison terms. Despite a deprived childhood, Ballew had opportunities some children only dream about, *e.g.*, an athletic scholarship and a college education. Instead of devoting himself to pursuing those opportunities, Ballew chose to sell drugs and engage in kidnapping and murder. Thus, we find that the death penalty is appropriate.

**{¶ 78}** We further conclude that imposing the death penalty is neither excessive nor disproportionate when compared with the penalty in similar felony-murder cases of kidnapping. *State v. Joseph* (1995), 73 Ohio St.3d 450, 653 N.E.2d 285; *State v. Simko* (1994), 71 Ohio St.3d 483, 644 N.E.2d 345; *State v. Fox* (1994), 69 Ohio St.3d 183, 631 N.E.2d 124; *State v. Jells* (1990), 53 Ohio St.3d 22, 559 N.E.2d 464; *State v. Brewer* (1990), 48 Ohio St.3d 50, 549 N.E.2d 491; and *State*

*v. Morales* (1987), 32 Ohio St.3d 252, 513 N.E.2d 267.  Accordingly, the judgment of the court of appeals is affirmed.

*Judgment affirmed.*

MOYER, C.J., DOUGLAS, F.E. SWEENEY, PFEIFER, COOK and KLINE, JJ., concur.

ROGER L. KLINE, J., of the Fourth Appellate District, sitting for STRATTON, J.

———————————